MAGISTRATE JUDGE DENLOW

JUDGE CASTILLO

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | No. 08CR 327 |
| v. | ) | Violation: Title 18, United States Code, Section 1341 |
| KAMLESHWAR GUPTA and KAM ENGINEERING, INC. | ) | |

FILED
APR 1 7 2008 TC
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**COUNT ONE**

The SPECIAL JUNE 2007 GRAND JURY charges:

1. At times material to this Indictment:

**Relevant Individuals and Entities**

(a) KAM ENGINEERING, INC. ("KEI"), an engineering consulting firm with its principal place of business in Elgin, Illinois, was a corporation registered in the State of Illinois.

(b) Defendant KAMLESHWAR GUPTA was the founder, president, and sole shareholder of KEI.

(c) The Illinois Department of Transportation ("IDOT") was an Illinois state agency responsible for planning, construction, and maintenance of Illinois' transportation network, including highways and bridges, airports, public transit, rail freight and rail passenger systems. IDOT's responsibilities included administering federal and state highway funds in Illinois, including substantial funds from the Federal Highway Administration.

(d) Defendant KEI performed engineering consulting work on a variety of jobs for IDOT.

**Billing Methods Used on KEI's IDOT Contracts**

(e) IDOT used four primary billing methods: lump sum; variable lump sum; cost plus; and direct labor multiplier. Each of these billing methods involved different ways of allowing for both direct labor costs and indirect costs (commonly referred to as "overhead" costs). At various times, work done on jobs by KEI was billed to IDOT under each one of those four methods.

(f) Under a "lump sum" contract, KEI negotiated a base price for all the work to be performed, and this base price included KEI's overhead costs. There was no requirement that KEI submit documentation supporting the overhead costs because those costs were quantified as money in the contract. The supporting documentation for these contracts was maintained by KEI.

(g) Under a "variable lump sum" contract, KEI identified its direct costs in terms of a total dollar amount. The estimated direct labor costs were multiplied by the previous year's overhead calculation, as represented by KEI. KEI was responsible for submitting an accurate estimate of its overhead costs and maintaining all supporting documentation for the work performed on the contract, as well as for its administrative and overhead expenses, which were subject to audit.

(h) Under a "cost plus" contract, KEI negotiated the amount of direct labor cost in terms of the hours needed to complete the job. KEI also submitted the names of its employees

expected to work on the project, and the actual amounts they were to be paid. The cost plus calculation then multiplied direct labor costs by the overhead determination, which resulted in a maximum amount billable under the contract. KEI was responsible for accurately submitting the hours and expenses directly occurring on these contracts, as well as an accurate estimate of its overhead cost. As with other contracts, KEI was still responsible for maintaining all of its supporting documentation for the hours worked, direct expenses and overhead costs, which were subject to audit.

(i) Under a "direct labor multiplier" contract, KEI submitted an actual "direct labor cost" billing for the work actually performed on the contract by eligible employees. IDOT awarded a "multiplier" of direct labor cost in addition to the actual labor cost; in many contracts, this multiplier was negotiated and subject to adjustment based on reported overhead expenses. Certain contracts also included an additional percentage allowance for "profit." KEI was responsible for submitting its actual hours and expenses directly occurring on the contract. As with other types of IDOT contracts, KEI was responsible for maintaining its documentation in support of its invoices and overhead calculations, which were subject to audit.

(j) The "cost plus" and "variable lump sum" contracts awarded by IDOT to by KEI were partially based on an overhead percentage. The calculation of this overhead percentage was governed by "Cost Accounting Standards" and/or Federal Acquisition Regulations which generally were referred to in each IDOT contract. The percentage was calculated by dividing the indirect cost by the direct labor costs of business for the previous year. In support of its calculated percentage, KEI annually filed a document with IDOT known as a

"Statement of Experience and Financial Condition" (SEFC). Within the SEFC were statements of accounts to support its claims of indirect costs and categories of those costs. These costs included the costs which could not be attributed to a particular job, supported by tax returns for the previous year. These documents were used to formulate an overhead calculation based on the prior year's economic condition. The documentation to support these costs and overhead calculation was to be maintained by KEI during the normal course of business. KEI's proposed percentage for overhead was applied to its contracts for that year, pending a review by auditors to confirm or modify the percentage.

(k) IDOT and the other agencies trusted that the information reported by KEI on its invoices regarding the hours worked on IDOT jobs by KEI employees, as well as the information KEI provided for use in calculating KEI's overhead, was accurate, and the accuracy of this information was material to IDOT. To ensure honesty and to prevent fraud, IDOT required as part of the billing process that firms submit properly documented invoices, including documentation that accurately reflected the actual costs incurred on each contract. KEI was also required to submit accurate information concerning administrative costs that were allocated to each respective contract. In support of the invoices submitted to IDOT, KEI was required to maintain the employee's time sheets, internal documentation of hours per job, and other supporting documentation. As part of their duties, IDOT audit staff conducted audits related to consultant overhead and cost claims.

**KEI's Timekeeping Procedures on IDOT Contracts**

(l) Employees at KEI used timesheets to keep track of hours worked on various jobs. Employees recorded hours spent each day under job codes specific to each particular job. Hours worked by an employee that were not attributable to any particular job were recorded under the "General" category, which was used in computing KEI's overhead for purposes of IDOT contracts.

(m) The bookkeeping department at KEI reviewed the original timesheets prepared by employees. Bookkeeping made copies of the original timesheets, called "mark-up timesheets" and posted the hours reflected on the mark-up timesheets onto ledger sheets called "green sheets." Personnel summaries, which reflected the hours worked by employees on each particular job, were created from the information reflected on the green sheets. The personnel summaries were then attached to invoices for submission to IDOT.

(n) KEI performed work for IDOT both as a primary contractor and as a subcontractor. When KEI was the primary contractor on a project, KEI submitted its invoices directly to IDOT. IDOT approved each invoice and submitted it for payment to the Illinois state comptroller, who then issued a check payable to KEI and mailed it to KEI. When KEI was a subcontractor on a project, KEI submitted its invoices to the primary contractor, which then attached the KEI invoices to its own invoices, which were then issued to IDOT. IDOT approved each invoice and submitted it for payment to the Illinois state comptroller, who

then issued a check payable to the primary contractor. Upon receipt of payment from the Illinois state comptroller, the primary contractor then issued a check to KEI.

**The Scheme to Defraud IDOT**

2. Beginning no later than in or about 1994 and continuing until at least in or about August 2003, in the Northern District of Illinois and elsewhere,

KAMLESHWAR GUPTA, and
KAM ENGINEERING, INC.,

defendants herein, knowingly devised, intended to devise, and participated in a scheme to defraud and obtain money from IDOT by means of materially false and fraudulent pretenses, representations, and promises, which scheme is further described in the following paragraphs.

3. It was part of the scheme to defraud that defendants KAMLESHWAR GUPTA and KEI submitted invoices to IDOT, as well as financial information to be used in the calculation of overhead expenses on KEI's contracts with IDOT, which defendants knew contained false information regarding the number of hours worked by KEI employees.

4. It was further part of the scheme to defraud that defendants KAMLESHWAR GUPTA and KEI fraudulently altered KEI's timekeeping records by moving and causing to be moved hours among different KEI jobs and contracts. Defendants KAMLESHWAR GUPTA and KEI caused these fraudulently altered hours to be reported to IDOT in order to fraudulently increase the amount of money that KEI billed to and collected from IDOT.

5. It was further part of the scheme that, contrary to the regulations applicable to IDOT contracts, defendants KAMLESHWAR GUPTA and KEI caused KEI to require its employees to keep timesheets in pencil, rather than in ink, in order to facilitate fraudulent alterations of employee timekeeping records.

6. It was further part of the scheme that defendant KAMLESHWAR GUPTA at times directed Individual A, a bookkeeper, to alter original employee timesheets, even though there was no basis for believing that the originally reported time was incorrect. Acting at defendant GUPTA's direction, Individual A erased the hours and job codes on the original timesheets and wrote in changed information as ordered by defendant GUPTA. At times, Individual A handwrote the changes ordered by GUPTA onto the mark-up timesheets and green sheets. In this way, defendants GUPTA and KEI manipulated labor and overhead so as to increase the amounts that would be paid to KEI by IDOT, including by inflating the hours for which KEI could bill under contracts that paid KEI for hours worked, and by inflating KEI's overhead costs.

7. It was further part of the scheme that once the changes were made, Individual A created personnel summaries and invoices incorporating the fraudulent information. Defendant KAMLESHWAR GUPTA signed the fraudulent invoices.

8. It was further part of the scheme that from in or about 1994 through in or about August 2003, defendant KAMLESHWAR GUPTA caused defendant KEI to mail IDOT invoices that fraudulently overbilled IDOT in an amount totaling approximately

$1,069,293.44 and caused the Illinois state comptroller to issue and mail checks to KEI for amounts that included these fraudulently overbilled amounts.

9. It was further part of the scheme that defendant KAMLESHWAR GUPTA concealed, misrepresented, and hid and caused to be concealed, misrepresented, and hidden, the existence and purpose of the scheme and the acts done in furtherance of the scheme.

10. On or about April 17, 2003, in the Northern District of Illinois and elsewhere,

KAMLESHWAR GUPTA and,
KAM ENGINEERING, INC.

defendant herein, for the purpose of executing the aforesaid scheme, and attempting to do so, did knowingly cause to be delivered by mail according to the direction thereon an envelope containing check # AC834304 issued by the State of Illinois in the amount of $5,603.35 made payable to Kam Engineering, Inc., that envelope being addressed to Kam Engineering, Inc, 707A Davis Road, Elgin, Illinois, 60123;

In violation of Title 18, United States Code, Section 1341.

**COUNT TWO**

The SPECIAL JUNE 2007 GRAND JURY further charges:

1. Paragraphs 1 through 9 of Count One of this indictment are re-alleged and incorporated herein as if fully set forth.

2. On or about May 13, 2003, in the Northern District of Illinois and elsewhere,

KAMLESHWAR GUPTA, and
KAM ENGINEERING, INC.

defendant herein, for the purpose of executing the aforesaid scheme, and attempting to do so, did knowingly cause to be delivered by mail according to the direction thereon an envelope containing check # 34503 issued by BL&A in the amount of $13,990.74 made payable to Kam Engineering, Inc., sent from BL&A at 1010 Jorie Blvd., Oak Brook, Illinois, 60523 to Kam Engineering Inc., 707 East Davis Road, Elgin, Illinois, 60123;

In violation of Title 18, United States Code, Section 1341.

**COUNT THREE**

The SPECIAL JUNE 2007 GRAND JURY further charges:

1. Paragraphs 1 through 9 of Count One of this indictment are re-alleged and incorporated herein as if fully set forth.

2. On or about May 27, 2003, in the Northern District of Illinois and elsewhere,

KAMLESHWAR GUPTA, and
KAM ENGINEERING, INC.

defendant herein, for the purpose of executing the aforesaid scheme, and attempting to do so, did knowingly cause to be delivered by mail according to the direction thereon an envelope containing check # 6113 issued by CR&A in the amount of $83,897.44 made payable to Kam Engineering, Inc., sent from CR& A at 211 West Wacker Drive, Suite 600, Chicago, Illinois 60606 to Kam Engineering Inc., 707 East Davis Road, Elgin, Illinois, 60123;

In violation of Title 18, United States Code, Section 1341.

**COUNT FOUR**

The SPECIAL JUNE 2007 GRAND JURY further charges:

1. Paragraphs 1 through 9 of Count One of this indictment are re-alleged and incorporated herein as if fully set forth.

2. On or about August 25, 2003, in the Northern District of Illinois and elsewhere,

KAMLESHWAR GUPTA, and
KAM ENGINEERING, INC.

defendant herein, for the purpose of executing the aforesaid scheme, and attempting to do so, did knowingly cause to be delivered by mail according to the direction thereon an envelope containing check # 35043 issued by BL&A in the amount of $165,199.60 made payable to Kam Engineering, Inc., sent from BL&A at 1010 Jorie Blvd., Oak Brook, Illinois, 60523 to Kam Engineering Inc., 707 East Davis Road, Elgin, Illinois, 60123;

In violation of Title 18, United States Code, Section 1341.

**FORFEITURE ALLEGATION**

The SPECIAL JUNE 2007 GRAND JURY further charges:

1. The allegations contained in Counts One through Four of this Indictment are realleged and incorporated herein by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

2. As a result of his violation of Title 18, United States Code, Section 1341, as alleged in the foregoing Indictment,

KAMLESHWAR GUPTA, and
KAM ENGINEERING, INC.

defendants herein, shall forfeit to the United States, pursuant to Title 18, United States Code, Section, 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any and all right, title and interest in property, real and personal, which constitutes and is derived from proceeds traceable to the charged offense.

3. The interests of the defendants subject to forfeiture pursuant to Title 18, United States Code, Section, 981(a)(1)(C) and Title 28, United States Code, Section 2461(c) include but are not limited to:

$1,069,293.44

4. If any of the property subject to forfeiture and described above, as a result of any act or omission of the defendant(s):

(a) Cannot be located upon the exercise of due diligence;

(b) Has been transferred or sold to, or deposited with, a third party;

(c) Has been placed beyond the jurisdiction of the Court;

(d) Has been substantially diminished in value; or

(e) Has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property under the provisions of Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

All pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

A TRUE BILL:

________________________
FOREPERSON

________________________
UNITED STATES ATTORNEY